**UNITED STATES of America**

**v.**

**Michael Joseph CUNNINGHAM.**

**Crim. No. 71–597.**

United States District Court,
E. D. Pennsylvania.

June 14, 1972.

James C. Sommar, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Peter Gale, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

DITTER, District Judge.

Michael Joseph Cunningham was indicted for wilfully and knowingly failing to submit to induction into the Armed Forces in violation of 50 App. U.S.C. § 462. It is unquestioned that although he reported as ordered to an induction center, he intentionally refused to step forward and answer when his name was called.

The defendant, who was born in October, 1951, filled out a Classification Questionnaire (SSS Form 100) in January, 1970, with Local Board 59, Upper Darby, Pennsylvania. His only claim for deferment was as a student. In December, 1970, having graduated from high school, he was classified 1–A, was given a physical examination, and on February 18, 1971, was mailed orders to report for induction on March 4, 1971.

Cunningham asserts two defenses to the present prosecution:

1. The order of call by the State Selective Service System was illegal and therefore his notice to report for induction was invalid; and

2. He is entitled to a deferment as a conscientious objector, his draft board having erred in refusing to grant his request for that classification even though it was not made until after he received his notice for induction.

In view of the defendant's first contention, a brief review of the procedure for summoning draft inductees is necessary. Under the applicable regulations, the Secretary of Defense determines the armed forces manpower requirements for a given month at least 60 days in ad-

vance. Thereafter he notifies the National Director of Selective Service to provide that number of men and the National Director allocates to the states their respective quotas. Each State Director of Selective Service is responsible for dividing this requirement among the local boards of his state in order to produce the men desired.

The testimony established that for a given month Pennsylvania has to order more men for induction than are actually required of it by the National Director. Experience has shown that of the men sent for induction, a substantial percentage will be found not qualified, some will obtain postponements, others will fail to report, and a certain number will refuse induction. The State Director took these factors into consideration in making his calls on the local boards for the months of January, February, and March, 1971.

In December, 1970, the National Director ordered Pennsylvania to provide 816 men for the month of January, 1971. In January, a similar call was made for 783 men in February, with 625 being requested for March, 1971. Responding to these calls, Pennsylvania told 2689 men to report for induction in January, 2243 in February, and 1124 in March. Of these numbers, 1183 men were inducted in January, 974 in February, and 401 in March.

For March, 1971, the month Cunningham was ordered for induction, the State Director called upon Local Board No. 59 to deliver 13 men. In making this determination, he took into account the number of men previously reported as available. In addition, like all boards, Local 59 was directed to send for induction all available registrants whose random sequence, or lottery number, was below 100.[1] Defendant's random sequence number was 78. Local Board No. 59 listed 15 men, including Cunningham, for induction, but of this number, only two were actually inducted in

March. Cunningham was postponed for further medical consideration and eventually ordered to report in May, 1971.

The defendant contends it was illegal for the State Director to call for the induction of that group of men composed of registrants designated by certain random sequence numbers as contrasted with requiring each board to deliver a fixed number of men. The same argument was raised and rejected in United States v. Thompson, 443 F.2d 341, 342 (9th Cir.1971) and United States v. Munoz, 451 F.2d 1270 (9th Cir.1971). I can find nothing in the regulations to suggest men could not be called by random sequence number and later this procedure was adopted nationally.

Cunningham also maintains that the calls state-wide for January, February, and March, 1971, were illegal because too many men were inducted. Cunningham does not suggest that he was called out of order, that is, someone with a higher numerical priority should have been called first. Rather, he argues that if the exact number of men needed for January and February had been summoned, more men would have been left to be called for March and he would not have been reached until April by which time he would have established that he was a conscientious objector.

In state-wide draft calls, however, mathematical precision is impossible to achieve. It is therefore obvious that a certain amount of discretion must be vested in the State Director. "The problems of the State Director must be borne in mind and the regulations read with sufficient flexibility to provide him room to meet his responsibilities. His duty to the state is to deliver a specified number of men. The question remains how many men must be ordered for induction in order to meet this quota. . . . [H]is determination is based on state-wide experience as to the extent of

---

1. Similar directions had been given for the months of January and February for random sequence numbers to 40 and 85 respectively.

state-wide overcall of registrants necessary to produce the state quota." United States v. Jones, 431 F.2d 619, 620 (9th Cir.1970).

James H. Evans was subpoenaed by the defendant. In 1970 and 1971, Mr. Evans was in charge of determining for the State Director of Selective Service the number of draft registrants to be called state-wide and from each local board. He testified that an attempt was always made to summon no more then the number of men required for each month. The only exception was if there had been a deficiency from a prior month. Nevertheless, the controlling factors varied so unpredictably that the actual number of men inducted often differed from the results which had been projected. For example, in December, 1970, the rejection rate was 36%, but for January it fell to 22%. The difference, 14%, when applied to the number of men ordered to report in January, would represent a surplus of 376 men. Actually, for January 367 more men than required were inducted. Before the results for January were known, the

February call was made and again too many men were inducted. In March, however, the number inducted fell below the number called for by the National Director. It was also Mr. Evans belief that Pennsylvania's March quota had been adjusted to reflect the overages delivered in January and February. The figures support his opinion. In each of these three months, January, February, and March, 1971, the National requirement was for 17,000 men. However, the quota assigned to Pennsylvania was only 625 for March as compared with 816 for January and 783 for February. As shown by the summary below, based on the number of men ordered to report for induction, there was an overage, or error, of less then six per cent for the three months. Considering the lead times required, the unpredictable nature of the factors which controlled, and the number of men involved, it is clear the State Director was operating well within the bounds of proper discretion in making his calls for these three months and Cunningham's contention to the contrary must fail.

| 1971 | National Quota | Pa. Quota | Ordered to Report | Inducted | Pa. Quota Exceeded By | Per cent of error as measured Against men Ordered to Report | Per cent by which Inductees Exceeded Quota |
|---|---|---|---|---|---|---|---|
| Jan. | 17,000. | 816 | 2689 | 1183 | 367 | + 13.6% | + 45% |
| Feb. | 17,000. | 783 | 2243 | 974 | 191 | + 8.5% | + 24% |
| Mar. | 17,000. | 625 | 1124 | 401 | −224 | − 19.9% | − 36% |
| Total | 51,000. | 2224 | 6056 | 2558 | 334 | 5.5% | + 15% |

Cunningham's second defense is that Local Board No. 59 erred in denying him an opportunity to establish that he was a conscientious objector and thus not liable for induction. It is his position that he had conscientious scruples against warfare prior to February 18 when the Board mailed him notice to report for induction. However, he said he did not know a registrant's opposition to

war for reasons of conscience might entitle him to an exemption. He was not made aware of this fact until February 19, the day he received his induction notice. Cunningham contends that once he learned of the possibility of exemption, he was entitled to a hearing on the merits of his beliefs, and that if it had been afforded him, the Board would have ruled in his favor.[2]

2. The record does not support him when he suggests the Board felt he was sincere and entitled to exemption. At one point it shows that "Mr. Shea stated to registrant that he believes he is against war and not violence." This hardly consti-

Local Board No. 59 permitted Cunningham to file the necessary form to request classification as a conscientious objector. He was then interviewed and the Board found that since he had objected to war since 1969 and to serving with the military, there was no reason why these facts could not have been made known to the Board prior to the time his induction notice was mailed. Orders were then issued for him to report to be inducted in May, 1971.

■ Cunningham's position collapses for reasons of fact and law. In the first place, I simply do not believe him when he states that prior to February 19, 1971, he did not know about the possibility of being a conscientious objector. He had average marks in school, and is apparently of average intelligence. He and his friends talked about the war, and Cunningham participated in classroom discussions concerning it. One of his former teachers, the Reverend Thomas R. Hennigan, a Catholic priest, wrote to the Board, "We have spoken about the Indo China war and war in general many times." Cunningham's aunt, a nun, wrote to the Board "For the past two years we have discussed many current problems." Cunningham was present when one of his contemporaries stated his opposition to war. The questionnaire which he filled out in January, 1970, § VIII, had a space for those who were conscientious objectors. Numerous stories have appeared in the mass media about conscientious objectors. I conclude, as Local Board No. 59 found after interviewing Cunningham, that he expected to be exempted because of his eyesight and that he had not requested conscientious objector status because he was not sure that he would refuse induction.

It would be virtually impossible for a young man of average intelligence attending high school, who discussed the war with fellow students and members of the faculty and "current problems" with his aunt, to be as ignorant as Cunningham claims he was. His story is preposterous, contradicted by the evidence, and I reject it.

Legally Cunningham's defense is no better than it is factually. Although he contends his draft board's failure to give him a hearing on the merits of his beliefs amounts to denying him a forum in which to present them, this is not so. Prior to February 18, the day his induction notice was mailed, the defendant could have presented his claim to Local Board No. 59 for its consideration. The beliefs which would have formed the basis for that claim existed long before that date. He just failed to assert them. ". . . [w]here as here, the local board has mailed an order to report for induction to the registrant, it may not reopen the classification 'unless the local board first specifically finds there has been a change in the registrant's status resulting from circumstances over which the registrant has no control.' 32 CFR § 1625.2." United States v. Powell, 449 F.2d 706, 710 (3rd Cir.1971).

■ A conscientious objector claim which crystallizes in the mind of a registrant after his induction notice has been mailed is not the type of circumstance which will permit his draft board to reopen the question of classification: Ehlert v. United States, 402 U.S. 99, 91 S.Ct. 1319, 28 L.Ed.2d 625 (1971). "Of course, if a late maturing conscientious objector belief is not a circumstance beyond the registrant's control which would permit reopening of his classification, a claim fully matured before his induction notice was sent also would not be such a circumstance." United States v. Donaldson, 336 F.Supp. 1086, 1087 (E.D.Pa.1972).

The defendant was not denied a forum in which to present his views—he just

---

tutes a finding by the Board that Cunningham was a conscientious objector. The Board also said Cunningham "was expecting to be medically disqualified be-

cause of eyesight." I do not interpret this comment to be an acknowledgment of his sincerity as a conscientious objector.

failed to take advantage of his opportunity within the time limits allowed and the real meat of his contention is that these limits should have been extended. I can find no basis in law or logic to support his argument.

"We can see no sound reason why a regulation may not require that claims for deferment should be advanced as soon as they have matured. If young men eligible for the draft are permitted endlessly to challenge their status and to claim review of adverse determinations, the effect on the Selective Service System would be chaotic for manpower quotas could rarely be met with any degree of certainty. . . . Years of experience have demonstrated that it is necessary and reasonable to set limits on the time in which a claim must be asserted in the litigation which floods our courts; so, too, it is essential and proper for an administrative agency, particularly one as large and complex as the Selective Service System, to require that claims be raised within reasonable time limits or be forfeited. We hold, therefore, as applied to applicants whose conscientious objections matured prior to receipt of an Order to Report for Induction, § 1625.2 is wholly justified as part of an orderly administrative process. These objectors . . . have had ample opportunity to raise their claim of conscientious objection before an induction notice was sent, and they cannot justly complain that the Local Board refused to reopen their classifications." United States v. Gearey, 368 F.2d 144, 149 (2d Cir.1966). The Selective Service System needs and has the power to make reasonable timeliness rules for the presentation of claims to exemption from service, with the penalty of forfeiture for non-compliance. Ehlert v. United States, supra.

Therefore, I find the defendant, Michael Joseph Cunningham, wilfully and knowingly failed to submit to induction and is guilty of violating the provisions of 50 App.U.S.C. § 462. He shall report for sentence when ordered to do so.